James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, PC
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Staci Blevins, Sergey Bogomolov, Richard Haugan, Dale Talbot, et al., individually and on behalf of all others similarly situated<br><br>        Plaintiffs,<br><br>v.<br><br>Volkswagen AG, Volkswagen Group of America, Inc., Audi AG, Audi of America, LLC, Dr. Ing. h.c.F. Porsche AG, Porsche Cars North America, Inc., Daimler AG, Mercedes-Benz USA, LLC, Mercedes-Benz US International, Inc., Bayerische Motoren Werke AG, BMW North America, LLC, Defendants. | Civil Action No.<br><br>**COMPLAINT and**<br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

I.    Introduction ..................................................................................1

II.   Parties .........................................................................................6

      A.    Defendants ...........................................................................6

            1.    Volkswagen Defendants ........................................6

            2.    Audi Defendants ....................................................8

            3.    Porsche Defendants................................................9

            4.    Daimler Defendants .............................................11

            5.    BMW Defendants ................................................13

      B.    Plaintiffs ............................................................................14

            1.    Plaintiff Staci Blevins .........................................14

            2.    Plaintiff Sergey Bogomolov.................................14

            3.    Plaintiff Richard Haugan......................................14

            4.    Plaintiff Dale Talbot ...........................................15

III.  Jurisdiction and Venue..................................................................15

IV.   Factual Allegations .......................................................................16

      A.    The German Five and the U.S. Market for European
            Automobiles .......................................................................16

      B.    The Scheme to Collude to Dominate the Automotive
            Market ...............................................................................24

            1.    Defendants Shared Far More Information than
                  Normal Competitors Would .................................27

i

      2.      Defendants Used These Schemes to Enrich Themselves and to Deceive Consumers and Government Regulators ........................................29

    C.      Defendants Suspected That They Were Breaking the Law .............33

    D.      Defendants' Secret Scheme Is Revealed .........................................35

    E.      The Fallout: Outrage Over "Gigantic Fraud at the Expense of Customers and Suppliers"................................................36

V.     Class Action Allegations.........................................................................39

    A.      Class Definitions.............................................................................39

    B.      Class Certification Requirements: Federal Rule of Civil Procedure 23 ..................................................................................41

VI.    Any Applicable Statutes of Limitation are Tolled ...................................46

    A.      Discovery Rule ...............................................................................46

    B.      Fraudulent Concealment .................................................................47

    C.      Estoppel..........................................................................................47

VII.   Claims for Relief.....................................................................................48

    A.      Claims Asserted on Behalf of the Nationwide Class ......................48

    B.      Claims Asserted on Behalf of the California Class.........................68

    C.      Claims Asserted on Behalf of the Illinois Class .............................72

VIII.  Prayer for Relief .....................................................................................77

IX.    Demand for Jury Trial.............................................................................78

Plaintiffs Staci Blevins, Sergey Bogomolov, Richard Haugan, and Dale Talbot bring this action on behalf of themselves and all others similarly situated, against (1) the Defendants collectively known as "Volkswagen": Volkswagen AG and Volkswagen Group of America, Inc.; (2) the Defendants collectively known as "Audi": Audi AG and Audi of America, LLC; (3) the Defendants collectively known as "Porsche": Dr. Ing. h.c. F. Porsche AG, and Porsche Cars of North America, Inc.; (4) the Defendants collectively known as "Daimler": Daimler AG, Mercedes-Benz USA, LLC, and Mercedes-Benz US International, Inc.; and (5) the Defendants collectively known as "BMW": Bayerische Motoren Werke AG and BMW North America, LLC. Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to himself.

## I.    INTRODUCTION

1.    Free markets thrive on competition. Automakers, like companies in any industry, are supposed to compete with each other, such as by offering consumers greater quality, lower prices, better customer service, and other differentiators. Ordinarily, designing, manufacturing, and distributing a complex product like a modern automobile means that this competitive marketplace extends to competition between suppliers. In public, it has appeared as though Volkswagen, Audi, Porsche, Daimler, and BMW—the so-called "German Five"

automakers—were doing exactly that: competing fiercely amongst themselves for customers, striving to bring innovative, proprietary technology to market first, and driving competition between their parts suppliers. Volkswagen CEO Matthias Müeller, for example, praised the competition between the brands.[1] The CEO of Audi explained that competition gave them "a technological edge."[2] BMW CEO Harald Krüger stated that "This competition inspires us."[3]

2.      In reality, however, the Defendants have reportedly been secretly colluding with each other since the 1990s on matters ranging from technological development, supplier usage, and emissions goals.[4] They derived significant and concrete benefits from colluding: by sharing new technologies, agreeing when to bring them to market, and colluding in the selection of component parts, the Defendants significantly reduced and suppressed research and development costs amongst themselves, a savings they pocketed. They could still charge a premium price for their reputed engineering quality and innovation, but without the cost of independently innovating. This made them exceptionally profitable while driving competitors out of the market in the United States. Meanwhile, consumers still had

---

[1] Frank Dohmen, *The Auto Syndicate: Volkswagen, Audi, Porsche, BMW, and Daimler formed a cartel for years; One of the largest in German Economic History*, Der Spiegel (July 22, 2017), 2017 WLNR 22319248. This article is in German. The quotations and references throughout this Complaint are based on translations.

[2] *Id.*

[3] *Id.*

[4] *Id.*

to pay premium prices, did not benefit from innovation driven by real competition, and lost the alternatives provided by competitors other than Defendants.

3.    This is not the first time allegations of dishonest behavior have rocked the German auto industry. In late 2015, Volkswagen, Audi, and Porsche were caught cheating emissions testing, programming millions of cars worldwide to comply with emissions standards only when they were undergoing emissions testing while emitting up to 40 times the allowable levels of oxides of nitrogen during normal operation. This programming was a secretly embedded software algorithm designed and used to cheat emission tests and allow Volkswagen, Audi, and Porsche to sell hundreds of thousands of cars in the United States—and millions more worldwide—over a seven-year period that did not meet emissions standards.[5] These cars polluted our environment by spewing millions of tons of harmful pollutants into our air.[6] The whole time, Volkswagen branded itself as the world's foremost innovator of "clean" diesel technology, duping hundreds of thousands of environmentally-conscious American consumers who were willing to

---

[5] *See* Bill Chappell, *"It Was Installed For This Purpose," Volkswagen's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015), http://www.npr.org/sections/thetwo-way/2015/10/08/446861855/volkswagen-us-ceo-faces-questions-on-capitol-hill.

[6] *See Final Report: In Use Emissions Testing of Light-Duty Diesel Vehicles in the United States*, International Council on Clean Transportation (May 15, 2015), http://www.theicct.org/sites/default/files/publications/WVU_LDDVin-use_ICCT_Report_Final_may 2014.pdf.

pay a premium for "clean" diesel vehicles.[7] Daimler now stands accused of similar conduct.

4.    One would think these companies would have learned their lessons about deceiving the American public after facing billions of dollars in fines, recalls, and criminal charges.[8] But on July 21, 2017, German news outlet *Der Spiegel* revealed that over two decades, since the 1990s, Volkswagen, Porsche, and Audi have secretly met with Daimler and BMW thousands of times.[9] These five companies reportedly met over 1,000 times in the last five years alone,[10] in order to collude on car development, gasoline engines, diesel engines, brakes, transmissions, gearboxes, choices of suppliers, emissions controls, and even prices for parts.[11] The Defendants relied on the reputation of German engineering, quality, and innovation to charge consumers higher prices, all the while colluding to limit technological competition and lower their own costs.

---

[7] *Clean Diesel*, Volkswagen (last visited Feb. 8, 2016), *previously available at*, http://www.vw.com/features/clean-diesel/.

[8] *See, e.g.*, Neal Boudette, *Volkswagen Executive to Plead Guilty in Diesel Emissions Case*, The New York Times (July 25, 2017), https://www.nytimes.com/2017/07/25/business/volkswagen-diesel-scandal-oliver-schmidt-guilty.html?_r=0; Jack Ewing and Prashant S. Rao, *Daimler to Modify 3 Million Mercedes Cars Over Diesel Concerns*, The New York Times (July 18, 2017), https://www.nytimes.com/2017/07/18/business/daimler-diesel-emissions.html.

[9] Dohmen, *supra* note 1.

[10] *Id.*

[11] *Id.*

5.    After these meetings were revealed, shares of Volkswagen, Daimler, and BMW dropped sharply.[12] According to German Economics Minister Brigitte Zypries, "What's at stake here is nothing less than the credibility . . . of the whole German car industry."[13]



[14]

6.    These meetings were not harmless. Klaus Müeller, the head of the Federation of German Consumer Organizations, has stated that tens of thousands of consumers may have paid "a much too high price" for their vehicles.[15] Müeller

[12] Sara Forden and Tom Schoenberg, *U.S. is said to review allegations German carmakers colluded*, Bloomberg (July 25, 2017), https://www.bloomberg.com/news/articles/2017-07-25/u-s-is-said-to-review-allegations-german-carmakers-colluded.

[13] Mehreen Khan and Patrick McGee, *German carmaker shares suffer on cartel allegations*, Financial Times (July 24, 2017), https://www.ft.com/content/c9aee8a5-5c59-375e-8844-391d048fa855.

[14] *Id.*

[15] DPA, *EU-Kartellwächter prüfen Vorwürfe gegen Autobauer*, Süddeutsche Zeitung (July 24, 2017), http://www.sueddeutsche.de/news/wirtschaft/auto-eu-kartellwaechter-pruefen-vorwuerfe-gegen-autobauer-dpa.urn-newsml-dpa-com-20090101-170722-99-350077; *see also* Sven Egenter and Benjamin Wehrmann,

explained that consumers "could have paid a price driven by cartel agreement for a potentially inadequate vehicle."[16]

7.     Volkswagen admits that they used these meetings to exchange proprietary and competitively sensitive technical data, to establish joint technical standards, and to conspire to use only certain technical solutions and suppliers in new vehicles.[17] These meetings were nothing less than "agreements to systematically undermine free competition" at the expense of consumers.[18]

## II.    PARTIES

### A.    Defendants

#### 1.    Volkswagen Defendants

8.     **Volkswagen AG** is a German corporation with its principal place of business in Wolfsburg, Germany. It is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. Volkswagen AG is the parent corporation of (among others) Audi AG, Porsche AG, and the American subsidiaries of all three brands. According to Volkswagen AG, it sold 10.3 million cars worldwide in 2016,

---

*"The cartel"/German carmakers might face "wave of lawsuits,"* Clean Energy Wire, https://www.cleanenergywire.org/news/cartel-german-carmakers-might-face-wave-lawsuits.

[16] *Id.*

[17] Dohmen, *supra* note 1.

[18] *Id.*

including 6.47 million Volkswagen-branded cars, 1.87 million Audi-branded cars, and over 237,00 Porsche-branded cars. In 2016, Volkswagen AG sold more cars than any other automobile manufacturer in the world. Combined with its other brands, Volkswagen controls a roughly 13% share of the worldwide passenger car market, and a considerably higher share of the American market for German cars. Volkswagen AG's sales revenue in 2016 totaled €217 billion (approximately $255 billion) and sales revenue in 2015 totaled €213 billion (approximately $248 billion).

9.     **Volkswagen Group of America, Inc.** ("VWGOA") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. VWGOA is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen-branded automobiles, in all 50 states. In 2016 alone, VWGOA sold 322,948 vehicles.

10.    Volkswagen AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under numerous brand names worldwide (including Lamborghini, Bentley, Bugatti, SEAT, Skoda, as well as Ducati motorcycles, Scania and MAN commercial vehicles, and the Volkswagen, Audi, and Porsche brands). VWGOA advertises, markets, warrants, and distributes new Volkswagen automobiles in all 50 states. Volkswagen AG exerts a close

7

degree of control over the actions of its subsidiaries, including VWGOA. Together, the Volkswagen defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in New Jersey and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### 2.    Audi Defendants

11.    **Audi AG** is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is a subsidiary of Volkswagen AG and is the corporate parent of Audi of America, LLC. Audi AG designs, develops, manufacturers, and sells luxury automobiles. According to Audi AG, it sold 1.87 million cars worldwide in 2016, setting a new sales record, with sales revenues in 2016 totaling €59.3 billion (approximately $69.7 billion). Audi AG's operating profit in fiscal year 2016 was €4.8 billion (approximately $5.63 billion). Volkswagen AG acquired Audi AG's predecessor corporations between 1965 and 1969.

12.    **Audi of America, LLC,** ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. Audi of America is a wholly-owned U.S.

subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states. In 2016 alone, Audi America sold 210,213 vehicles in the United States.

13.    Audi AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Audi brand worldwide. Audi America advertises, markets, warrants, and distributes new Audi automobiles in all 50 states. Audi AG exerts a close degree of control over Audi America. Together, the Audi defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in New Jersey and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### 3.    Porsche Defendants

14.    **Dr. Ing. h.c. F. Porsche AG** ("Porsche AG") is a German corporation with its principal place of business in Stuttgart, Germany. Porsche AG designs, develops, manufacturers, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of Volkswagen AG. According to Porsche AG, it sold over 237,000 cars worldwide in 2016, setting a new sales record. Sales revenues in 2016

totaled €22.3 billion (approximately $26.2 billion). Porsche AG's operating profit

in fiscal year 2016 was €3.87 billion ($4.55 billion).

15.    Porsche AG has had a close relationship with Volkswagen because its

founder, Ferdinand Porsche, designed the first Volkswagen Beetle in the 1930s and

1940s. The two carmakers have cooperated on several vehicles in the decades since

then. Members of the Porsche family long owned a significant stake in

Volkswagen and served on the board, but Porsche AG was a separate and

independent corporation until relatively recently. In 2011, Volkswagen AG and

Porsche AG consummated a merger agreement that resulted in the Porsche and the

related Piech families' holding company maintaining a controlling 52.2% stake in

Volkswagen AG, while Porsche AG became a subsidiary of Volkswagen AG along

with the other brands in the Volkswagen portfolio (such as Audi).

16.    **Porsche Cars North America, Inc.** ("PCNA") is a Delaware

corporation with its principal place of business located at 1 Porsche Drive, Atlanta,

Georgia. PCNA is a wholly-owned subsidiary of Porsche AG, and it engages in

business, including the advertising, marketing and sale of Porsche automobiles, in

all 50 states. According to Porsche AG, 2016 represented its best annual results in

Porsche history in the U.S., with 54,280 automobiles delivered.

17.    Porsche AG develops, manufactures, advertises, markets, warrants,

and distributes new automobiles under the Porsche brand worldwide. PCNA

advertises, markets, warrants, and distributes new Porsche automobiles in all 50 states. Porsche AG exerts a close degree of control over PCNA. Together, the Porsche defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in New Jersey and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### 4.    Daimler Defendants

18.    **Daimler AG** is a German corporation with its principal place of business in Stuttgart, Germany. It is a major worldwide automaker and is in the business of designing, developing, manufacturing, and selling automobiles. In 2016, Daimler's Mercedes-Benz and Smart brands sold over 2.3 million vehicles worldwide. Daimler's sale revenue in 2016 totaled €153 billion (approximately $180 billion). For Mercedes-Benz brand cars alone, Daimler's sales revenue totaled €89 billion (approximately $105 billion).

19.    **Mercedes-Benz USA, LLC** ("MBUSA") is a Delaware limited liability corporation with its principal place of business at 303 Perimeter Center North, Atlanta, Georgia, although prior to July 2015, MBUSA maintained its principal place of business in Montvale, New Jersey. MBUSA is a wholly-owned

subsidiary of Daimler AG, and it engages in business, including the advertising, marketing and sale of Mercedes-Benz automobiles, in all 50 states. In 2016, MBUSA sold 346,451 Mercedes-Benz vehicles in the United States.

20. **Mercedes-Benz US International, Inc.** ("MBUSI") is an Alabama corporation with its principal place of business at 1 Mercedes Drive, Vance, Alabama. MBUSI is a wholly-owned subsidiary of Daimler AG, and it assembles Mercedes-brand luxury cars and SUVs for sale in all 50 states.

21. Daimler AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Mercedes-Benz, Mercedes-AMG, and Smart brands worldwide (as well as several commercial vehicle brands and MV Agusta motorcycles). MBUSA advertises, markets, warrants, and distributes new Mercedes-Benz, Mercedes-AMG, and Smart automobiles in all 50 states. Since 1997, hundreds of thousands of these vehicles have been assembled by MBUSI. Daimler AG exerts a close degree of control over MBUSA and MBUSI. Together, the Daimler defendants developed, marketed, assembled, and distributed millions of vehicles in the United States since joining the cartel alleged herein. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in New Jersey and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

12

5.    **BMW Defendants**

22.    **Bayerische Motoren Werke AG** ("BMW AG") is a German corporation with its principal place of business in Munich, Germany. It is a major worldwide automaker and is in the business of designing, developing, manufacturing, and selling automobiles. BMW AG sold over 2.3 million vehicles worldwide in 2016, of which over 2 million were BMW-branded automobiles. In 2016, BMW AG's sale revenue totaled €86 billion (approximately $101 billion).

23.    **BMW North America, LLC** ("BMW America") is a Delaware limited liability corporation with its principal place of business at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey. BMW America is a wholly-owned subsidiary of BMW AG, and it engages in business, including the advertising, marketing and sale of BMW automobiles, in all 50 states. In 2016, BMW America sold 365,204 BMW automobiles in the United States.

24.    BMW AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles worldwide under the BMW, Mini, and Rolls-Royce brands (as well as BMW-brand motorcycles). BMW America advertises, markets, warrants, and distributes new BMW automobiles in all 50 states. BMW AG exerts a close degree of control over BMW America. Together, the BMW defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein. They also together developed and disseminated

the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in new Jersey and the rest of the United States, with the intent that these documents would be distributed in all 50 states

## B.    Plaintiffs

### 1.    Plaintiff Staci Blevins

25.    Staci Blevins, a resident of San Pedro, California, bought a 2014 BMW 428i for approximately $47,000 on or about May 14, 2017 from Rusnak BMW in Thousand Oaks, California. Plaintiff Blevins paid a premium for a vehicle that was advertised as offering high-quality, cutting-edge German engineering, technology, and luxury.

### 2.    Plaintiff Sergey Bogomolov

26.    Sergey Bogomolov, a resident of Chicago, Illinois, bought a 2011 BMW 550i for approximately $52,000 on or about June 6, 2014 at Perillo BMW Chicago, in Chicago, Illinois. Plaintiff Bogomolov paid a premium for a vehicle that was advertised as offering high-quality, cutting-edge German engineering, technology, and luxury.

### 3.    Plaintiff Richard Haugan

27.    Richard Haugan, a resident of Bainbridge Island, Washington, bought a 2011 BMW 328i for approximately $35,000 on or about September 14, 2010 at

BMW Northwest in Tacoma, Washington. Plaintiff Haugan paid a premium for a vehicle that was advertised as offering high-quality, cutting-edge German engineering, technology, and luxury.

### 4.    Plaintiff Dale Talbot

28.    Dale Talbot, a resident of Denham Springs, Louisiana, bought a 2011 Audi A6 for approximately $19,000 on or about May, 2017 at Brian Harris Audi, in Baton Rouge, Louisiana. Plaintiff Talbot paid a premium for a vehicle that was advertised as offering high-quality, cutting-edge German engineering, technology, and luxury.

### III.    JURISDICTION AND VENUE

29.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal antitrust claims asserted under the Sherman Act, 15 U.S.C. § 1 *et seq.*, and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims asserted under 18 U.S.C. § 1961 *et seq.* The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d),

and Cal. Code Civ. P. § 410.10, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

30.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, sold, and leased hundreds of thousands of vehicles, and otherwise conducted extensive business, within this District. For most of the relevant period, the conduct of at least two Defendants—MBUSA and BMW America, and by extension the American activities of the German corporate parents that closely control them—emanated from this District. BMW America still maintains its principal place of business within the District, while MBUSA moved its headquarters to Georgia in 2015.

## IV.    FACTUAL ALLEGATIONS

### A.    The German Five and the U.S. Market for European Automobiles

31.    Together, Volkswagen, Audi, Porsche, Daimler, and BMW are known as the German Five, the oldest and largest auto manufacturers in Germany. There are other automakers in Germany, but the German Five dominate the market there, and are viewed as competitors in the same market worldwide and in the United States. Together, they command the entire market for German Luxury Vehicles in the United States, and a significant share of the overall luxury or premium market. All five sell luxury vehicles in the United States; some of them also sell vehicles

that compete in other segments of the automobile market. From the highest end of the luxury market to the economical compacts sold by Volkswagen and BMW's MINI brand, the German Five benefit from colluding to limit competition, share technology, and cover for one another's frauds, all at the expense of American consumers.

32.    Today, Volkswagen, Audi, and Porsche exist under the same corporate umbrella, but this was not always the case. Volkswagen acquired one of Audi's predecessor corporations from Daimler in 1965, and completed the creation of what is now Audi in 1969. Although Volkswagen and Porsche have maintained a close relationship throughout their existence—because Porsche founder Ferdinand Porsche designed the original Volkswagen Beetle in the 1930s and 1940s—and Ferdinand Porsche's descendants long owned stock in Volkswagen, the two carmakers did not merge until 2011, long after the anticompetitive collusion alleged herein began.

33.    The German Five advertise their vehicles in the United States by emphasizing quality, precision engineering, and industry-leading luxury and technology features. Examples abound, but the clearest indicators are the companies' mottos.

34.    Since around 1970, BMW has marketed its cars as "The Ultimate Driving Machine."

17



35.    Daimler's Mercedes-Benz brand currently uses the tagline "The best or nothing."



36.    Between 2007 and 2015 (when the Dieselgate scandal made it more ironic than desirable), Audi used the slogan "Truth in Engineering."

18



37.    Porsche is well known for its racing exploits and reputation for quality, and has used numerous advertising taglines to that effect over the years, including "Porsche: there is no substitute." As another example, Porsche published the below advertisement emphasizing dominant racing results:



38.    Volkswagen is known for its creative advertising, which means that its advertising message has been less consistent over the years. However, Volkswagen also emphasizes the excellence of its engineering and technology. In recent years, this was especially true of the sophisticated "Clean Diesel" technology that drove Volkswagen's dominance of the diesel passenger car sector in the United States, allowed Volkswagen's "Clean Diesel" vehicles to cheat on emissions testing, and comprised a significant area of collusion by the cartel alleged herein. For example:

20

**This ain't your daddy's diesel.**

Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel.

- Engineered to burn low-sulfur diesel fuel
- "Common Rail" direct injection system

View key fuel efficiency info

39.     The advertised combination of world-leading engineering—in terms of quality, performance, technology, and luxury—set German automobiles apart from the rest of wider automobile market. And the German Five are able to charge premium prices as a result. But when they collude to limit their competitive advantages over one another—by agreeing to identical or very similar standards, by agreeing to limit technological development or by sharing technology, by covering for each other's emission cheating, by colluding to lower development and supplier costs—they damage both their competitors and their customers. By keeping costs of research and development and of parts from suppliers down, the premium prices they charge become exceptionally profitable.

40.     Research and technological development, as well as manufacturing infrastructure, are tremendously expensive in the automotive industry. Most new models require a lengthy design, development, and testing phase, as well as new

tooling even for existing production lines. Sharing technology and agreeing not to advance in competition with one another among the German Five reduces that expense—for them, but not their competitors—significantly.

41.    The result is that there are few obvious substitutes for most of the German Five's products. Sweden, Italy, and the United Kingdom all boast several automobile manufacturers that might be considered competitors in the American market for technologically advanced, luxurious, or high-performing automobiles, particularly those imported from Europe. But none of the seemingly plausible competitors has been able to provide effective competition for the German Five or to remain profitable in the American market.

42.    Volvo and Saab, the most direct competitors to the German Five in the American market, have both undergone a series of unprofitable periods, acquisitions, and bankruptcies since the cartel behavior alleged herein began. After a period under Ford control, Volvo is now owned by a Chinese conglomerate and still sells cars in the American market, but its market share has declined over time. Saab was once owned by General Motors but has since left the American market completely.

43.    The United Kingdom's car manufacturers have either suffered similar struggles to Volvo and Saab or have been acquired by the dominant German Five. Jaguar, Land Rover, and Aston Martin, like Volvo, were once owned by Ford. Like

Volvo, and even with Ford's existing dealer and distribution infrastructure in the United States, they were seldom profitable. In 2007, Ford sold Aston Martin. In 2008, Ford sold Jaguar and Land Rover to Tata Motors, an Indian automaker. Meanwhile, BMW AG acquired the parent of British automaker Mini in 1994, broke up the group in 2000, retaining only Mini, and brought Mini automobiles to the United States for the 2002 model year, advertising that the new BMW-developed Mini automobiles would boast BMW engineering. Volkswagen AG acquired Bentley and the then-related Rolls-Royce automobile business in 1998, but then sold the Rolls-Royce automobile business to BMW AG in 2003. Thus, Volkswagen AG has manufactured, advertised, and sold Bentley-branded vehicles since 2003, while BMW AG licenses the Rolls-Royce trademarks and has manufactured, advertised, and sold Rolls-Royce branded vehicles since 2003.

44.    Italy's Alfa Romeo left the American market in 1995, and finally returned recently after corporate parent Fiat acquired American automaker Chrysler and itself reentered the American market, using Chrysler's existing dealer and distribution network. Still, Alfa Romeo's market share is minuscule. At the highest end of the market, Ferrari and Maserati vehicles (close corporate relations of Fiat) are sold in small numbers in the United States; but Volkswagen AG acquired their most significant competitors in the United States, Lamborghini (in Italy) and Bugatti (in France) in 1998.

45.    Bugatti is the only French automobile brand sold in the United States, despite the large French auto industry. Renault, Peugeot, and Citroen all formerly sold cars in the United States and have considered returning to the market, but all have been kept out by the high barriers to entry that have been significantly exacerbated by the German Five's anticompetitive behavior.

46.    Defendants' competitors have rarely turned a profit in the United States since the 1990s, or have left the market and been unable to return. Most have undergone a crushing series of acquisitions and bankruptcies, with the most stable and profitable being those that are now owned by the German Five. For consumers, this means that there is limited choice in the market.

**B.    The Scheme to Collude to Dominate the Automotive Market**

47.    The German Five have been colluding for over two decades, pretending to compete while charging high prices for German engineering and innovation, all the while secretly sharing information and not competing in the advancement of the key technologies embedded in their cars.

48.    The German automakers have a legal way to share some information. It is called the Verband der Automobilindustrie (German Association of the Automotive Industry or VDA).[19] The VDA has over 600 members, including auto

---

[19] Caspar Busse, Thomas Fromm, & Wolfgang Janisch, *Wenn Firmen reden, kann es schnell heikel warden*, Süddeutsche Zeitung (July 25, 2017),

manufacturers like Defendants, Opel, Fiat's and Ford's German divisions, and numerous manufacturers of trucks, buses, and commercial vehicles. [20] It also includes over 500 suppliers of auto parts.

49.    However, this industry group was not exclusive enough for the Defendants. Since the 1990s, Defendants Volkswagen, Porsche, Audi, Daimler, and BMW have been holding covert meetings to share information away from the VDA's watch[21] and to coordinate behavior in the VDA meetings.[22] In an email obtained by *Der Spiegel*, Audi referred to an upcoming meeting of this smaller group as "secret."[23]

---

http://www.sueddeutsche.de/wirtschaft/autoindustrie-wenn-firmen-reden-kann-es-schnell-heikel-werden-1.3600991.

[20] Verband der Automobilindustrie, "Members," http://www.vda.de/en/association/members.html (last visited July 27, 2017).

[21] Bertel Schmitt, *Dieselgate Product of Vast Volkswagen-BMW-Daimler Car Cartel Conspiracy, Fresh Report Says*, Forbes (July 22, 2017), https://www.forbes.com/sites/bertelschmitt/2017/07/22/dieselgate-product-of-vast-vw-bmw-daimler-car-cartel-conspiracy-fresh-report-says/#1dd8d5797ce8.

[22] Max Hägler and Klaus Ott, *Lieber kungeln als konkurrieren*, Süddeutsche Zeitung (July 25, 2017), http://www.sueddeutsche.de/wirtschaft/autoindustrie-lieber-kungeln-als-konkurrieren-1.3600989; *see also* Statement by the German Association of the Automotive Industry (VDA), VDA (July 24, 2017), https://www.vda.de/en/press/press-releases/20170724-statement-by-the-german-association-of-the-automotive-industry--vda-.html. e

[23] Dohmen, *supra* note 1.



50.    Volkswagen has admitted that it participated in these covert meetings with Audi, Porsche, Daimler, and BMW.[25] These meetings began in the 1990s and were divided into five main areas: drive, set-up, chassis, electricity/electronics, and total vehicle.[26] Within these five areas, the Defendants formed sixty different task forces to collude on many different aspects of automotive development and manufacturing.[27] These working groups focused on various aspects of vehicles, such as mechanical components, brake control systems, seat systems, air suspension, clutches, gasoline engines, diesel engines, and emissions technology.

---

[24] Daimler CEO Dieter Zetsche, BMW CEO Harald Krüger, and Volkswagen CEO Matthias Müller. Schmitt, *supra* note 21.

[25] Dohmen, *supra* note 1.

[26] *Id.*

[27] *Id.*

51.     More than two hundred of the Defendants' managers and engineers attended these meetings over the course of two decades.[28] Over the last five years alone, the Defendants have secretly met more than 1,000 times.[29]

### 1.     Defendants Shared Far More Information than Normal Competitors Would

52.     Sharing information is not always forbidden.[30] The German Association of the Automotive Industry (VDA) has published guidelines on acceptable collaboration and provided examples of unacceptable topics including price and price strategies, delivery and payment terms with customers and suppliers, and information on company strategies and future market behavior.[31] The secret meetings in this case went far beyond the limited areas envisioned by the VDA or allowed by law.

53.     Volkswagen has stated that "[i]t is quite common for car manufactures all over the world to engage in an exchange on technical issues in order to accelerate the pace and quality of innovations."[32] But Volkswagen itself admitted that the information it and other Defendants exchanged was proprietary,

---

[28] *Id.*

[29] *Id.*

[30] Dohmen, *supra* note 1.

[31] Busse, *supra* note 19.

[32] Andreas Cremer, *Volkswagen says cooperation with rivals is common industry practice,* Reuters (July 26, 2017), http://www.reuters.com/article/us-germany-emissions-volkswagen-idUSKBN1AB2HY?il=0.

competitively sensitive technical data.[33] And far from accelerating the pace and quality of innovation, Defendants colluded to *limit* technological progress and competition: they agreed on jointly defined "technical standards" and agreed to use "only certain technical solutions" in new vehicles.[34] The Defendants agreed that no one company should have technology far ahead of the other members of the cartel.[35]

54.    Instead of competing to see who could offer the best technology to consumers to set themselves apart and justify the premium prices charged for "German engineering," the Defendants agreed that if one company obtained a breakthrough and was able to improve their technology, the others must be able to offer the same technology relatively quickly.[36] Exchanging this type of competitively sensitive technical data reduces or eliminates uncertainty about the current or future market behavior of the competitors and undermines the very underpinnings of a free market economy.

55.    Commonly, in the automotive industry, competitors analyze one another's cars by purchasing them on the open market, driving them, and taking them apart.[37] However, the Defendants here did not act like competitors. Instead,

---

[33] Dohmen, *supra* note 1.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

they freely exchanged technical data among themselves before bringing it to market and even agreed to limit the technology they would use. This giving and taking was the motto of the group according to an employee, who noted that it was simply part of the "friendly way" that the Defendants worked together at these meetings.[38]

### 2. Defendants Used These Schemes to Enrich Themselves and to Deceive Consumers and Government Regulators

56.     The meetings went well beyond normal information sharing by competitors. For example, in September of 2008, the Defendants met to discuss a "coordinated approach" to diesel emissions controls, and agreed to use only 8-liter tanks of the urea solution used to catalyze diesel exhaust and reduce emissions of certain pollutants.[39] These tanks neutralize the NOx emitted by diesel engines, making it safer for humans to breathe.[40] Making the tanks this small would save the Defendants "up to 80 EUR [$93] per vehicle,"[41] and would also leave more space for luxury features like high-fidelity stereo systems or roomier trunks with space for golf bags.[42] In an internal presentation, Audi stated that it was clear that a

---

[38] *Id.*
[39] Dohmen, *supra* note 1.
[40] Schmitt, *supra* note 21.
[41] *Id.*
[42] Dohmen, *supra* note 1.

commitment from the German automotive manufactures has been reached at Board

level.[43]



57.    The problem was that the Defendants knew that an 8-liter tank was

insufficient.[45] If the NOx was properly neutralized, the consumers would have to

refill the tank every 3,700 miles, well before the car was due for an oil change.[46] A

document reportedly written by Audi explained that "Daimler, Volkswagen, and

BMW concur" that the required size of the tank, in order to achieve the desired

service interval, was at least 19 liters.[47] However, the Defendants also agreed that

[43] *Id.*

[44] Cory Doctorow, *The German auto industry started conspiring on diesel
emissions in the 1990s*, BoingBoing (July 25, 2017),
http://boingboing.net/2017/07/25/ad-blue-cartel.html.

[45] Dohmen, *supra* note 1.

[46] Schmitt, *supra* note 21.

[47] Dohmen, *supra* note 1.

the price of this larger tank was "clearly too high."[48] An Audi manager wrote that a "coordinated future scenario was urgently needed."[49] Therefore, in June of 2010, the Defendants agreed to cap their urea tanks at 8 liters.[50] Volkswagen has since admitted to solving the refill problem by cheating on emissions tests and polluting the air.[51] Daimler has been accused of doing the same.



[52]

    58.    This agreement did not just save the Defendants money. It also helped them continue to fool regulators and cheat consumers. For example, in May of 2014, Audi warned the rest of the Defendants that getting into "an arms race of

---

[48] Hägler, *supra* note 22.

[49] Dohmen, *supra* note 1.

[50] *Id.*

[51] Chappell, *supra* note 5.

[52] Image of exhaust fumes from a car. *German carmakers colluded on diesel emissions: report*, France 24 (July 21, 2017), http://www.france24.com/en/20170721-german-carmakers-colluded-diesel-emissions-report

tank sizes" should be avoided as much as possible, because regulators would become suspicious as to why the tanks had to become larger if the smaller ones were sufficient.[53]

59.     Emission after-treatment was not the only area of collusion. As *Der Spiegel* reports, "[t]he system of agreements covered almost all areas of automotive development."[54]

60.     The companies also regularly met to discuss suppliers and assess their performance as a group. For example, on September 24, 2013, the companies met to discuss supplier performance.[55] Daimler criticized ZF, stating that the company was not good at handling electronically transmitted orders. Porsche agreed and added complaints about quality.[56]

61.     This collusion occurred in even areas that appear small. For example, the Defendants met and voted on the maximum speed at which the convertible roof of a car should open or close.[57] Volkswagen, Audi, Porsche, Daimler, and BMW all agreed not to compete with each other as to whose convertible could open or close at the fastest speed.[58] This allowed them to save money and weight and reduce their technical risk, at the expense of consumers who would not benefit

---

[53] Dohmen, *supra* note 1.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

from the natural free market incentives towards constantly improving products.

This is not mere speculation: companies like Ford that were competing with the

German automakers were actively working to improve their convertible roofs at

the same time.[59]


[60]

## C.    Defendants Suspected That They Were Breaking the Law

62.    The Defendants were not willing to share this information with

manufacturers outside of their secret group. In fact, Defendants actively worked to

ensure that these secret meetings remained private. When Jaguar, Volvo, Renault,

and Fiat reached out to share information, they were rejected.[61] Similarly, despite

---

[59] *Ford improves top design on its 2015 Mustang convertible*, Autoweek (March 2, 2014), http://autoweek.com/article/car-news/ford-improves-top-design-its-2015-mustang-convertible (mentioning that Ford made "welcome" improvements to its convertible, including halving the time it takes to open the top).

[60] Image of a BMW 2 Series soft top convertible. BMW (last visited July 26, 2017), https://www.bmwusa.com/vehicles/2series/convertible/gallery.html#!/16.

[61] *Id.*

their membership in the VDA and participation in the German automotive market, Ford, Opel, Fiat, and others were not invited to the meetings.[62]

63.    Defendants reportedly suspected that they might be violating the law. When they rejected information requests from other car companies, they expressed concerns that these meetings may be reported to the German Cartel Office.[63] Defendants became more secretive and careful. On October 1, 2010, leaders at a meeting in Paris reminded the others not to record anything particularly delicate in writing.[64]

64.    In 2011, the European Commission fined Daimler almost 1.1 billion euros for its membership in a truck cartel that also included Volkswagen subsidiary MAN.[65] After that, Daimler reportedly became nervous about the secret meetings with Volkswagen and BMW, and it reportedly trained 654 executives in German cartel law.[66] However, managers refused to stop the meetings because "otherwise [they] cannot sell cars anymore."[67] Daimler continued to attend the meetings, although it reportedly stayed away from certain meetings which were regarded as

---

[62] Schmitt, *supra* note 21.
[63] Dohmen, *supra* note 1.
[64] Hägler, *supra* note 22.
[65] Klaus Ott, *Wie die Autokonzerne alle Warnsignale ignorierten*, Süddeutsche Zeitung (July 24, 2017), http://www.sueddeutsche.de/wirtschaft/auto-kartell-wie-die-autokonzerne-alle-warnsignale-ignorierten-1.3599806.
[66] *Id.*
[67] *Id.*

"particularly problematic."[68] Similarly, in September of 2011, Daimler deleted the last two slides from a presentation it planned to give at one of these secret meetings after concluding that there were strong antitrust concerns relating to the information it had planned to share.[69]

### D.    Defendants' Secret Scheme Is Revealed

65.    The meetings were kept secret from the American public until *Der Spiegel* obtained information about an ongoing German investigation in July 2017. According to *Der Spiegel*, on June 23, 2016, the German Federal Cartel Office (Bundeskartellamt) conducted a search in connection with an investigation into a steel cartel, including suppliers who sell to auto manufacturers like Volkswagen, and seized documents.[70]

66.    Shortly thereafter, on July 4, 2016, Defendant Volkswagen reported itself to the European Commission, explaining that it suspected that it may have violated antitrust and competition laws.[71] Reportedly, Volkswagen suspected that its collusion with Daimler and BMW was about to be revealed and wanted to receive favorable treatment in exchange for reporting it first.[72] However, later

---

[68] *Id.*

[69] Dohmen, *supra* note 1.

[70] *Id.*

[71] *Id.*

[72] Under German law, the first member of a cartel to self-report can avoid paying any fines. Bertel Schmitt, *German Car Cartel Trigger Rat-Out-Race Between Daimler, Volkswagen and BMW*, Forbes (July 25, 2017),

information revealed that Daimler had also recognized that it was violating German law and reported itself to German authorities as early as 2014.[73] Daimler may have self-reported its membership in the cartel in 2014, but it did not report the conspiracy related to diesel emissions controls.[74]

67.    The timing of these admissions may matter to the German Cartel Office, but does not undo the harm that these companies have caused and continue to cause to United States consumers by conspiring together and failing to compete for more than two decades.

**E.    The Fallout: Outrage Over "Gigantic Fraud at the Expense of Customers and Suppliers"**

68.    The European Commission has confirmed that it is assessing the revelation that the German Five were operating as an illegal cartel.[75] The United States Department of Justice is also reportedly investigating.[76]

---

https://www.forbes.com/sites/bertelschmitt/2017/07/25/german-car-cartel-triggers-rat-out-race-between-daimler-volkswagen-and-bmw/2/#5e1573e35a79.
[73] *Id.*
[74] Thomas Kirchner, Hans Leyendecker, & Klaus Ott, *EU kennt seit Jahren Kartell-Verdacht in Autobranche*, Süddeutsche Zeitung (July 26, 2017), http://www.sueddeutsche.de/wirtschaft/illegale-absprachen-eu-kennt-seit-jahren-kartell-verdacht-in-autobranche-1.3604314.
[75] Mark Thompson, *European officials probe claims of huge German car cartel*, CNN Money (July 23, 2017), http://money.cnn.com/2017/07/22/investing/german-car-cartel-investigation/index.html.
[76] Forden, *supra* note 12.

69.    The German public is outraged. A German candidate for the Chancellery, Martin Schulz, warned that these allegations show "gigantic fraud at the expense of customers and suppliers," if true.[77] Juergen Pieper, a Frankfurt-based analyst with Bankhaus Metzler says that "[t]hese allegations look very serious and would mean more than 20 years of potential collusion. There seems to be a never-ending story of bad news about the industry's bad behavior."[78]



[79]

---

[77] *Cartel probe looms over German car industry*, EURACTIV (July 24, 2017), https://www.euractiv.com/section/transport/news/cartel-probe-looms-over-german-car-industry/.

[78] Elisabeth Behrmann, *German carmakers colluded on diesel controls, technology for decades: report*, Chicago Tribune (July 24, 2017), http://www.chicagotribune.com/business/ct-german-carmakers-collusion-20170724-story.html.

[79] Volkswagen CEO Matthias Müller, BMW CEO Harald Krüger, and Daimler CEO Dieter Zetsche. Busse, *supra* note 19.

70.    Volkswagen has admitted that it reported itself to the cartel authorities, but refuses to comment on "speculations."[80] Volkswagen held a special supervisory board meeting on July 26, 2017.[81]

71.    Daimler has also refused to comment on "speculations."[82] However, the head of Daimler's labor council, Michael Brecht, stated that "workers were rightly horrified and angry" by these allegations and demanded that "there must obviously be consequences" if they are confirmed.[83]

72.    BMW continues to deny the allegations. Since this story broke, BMW has suspended talks with Daimler regarding joint purchasing of car parts and efforts to develop charging stations for electric cars.[84] An industry source reports that BMW's trust in Daimler has been "totally damaged" and that the company is now "in the middle of a tsunami."[85]

---

[80] Schmidt, *supra* note 21.

[81] Elisabeth Behrmann, *Volkswagen, Daimler Workers Push for Carmaker Clarity on Collusion*, Bloomberg (July 24, 2017), https://www.bloomberg.com/news/articles/2017-07-24/vw-daimler-workers-step-up-pressure-to-come-clean-on-collusion.

[82] Schmitt, *supra* note 21.

[83] Behrmann, *supra* note 81.

[84] Thomas Fromm, Max Hägler, and Klaus Ott, *BMW fühlt sich von Daimler hintergangen*, Süddeutsche Zeitung (July 25, 2017), http://www.sueddeutsche.de/wirtschaft/autokartell-bmw-fuehlt-sich-von-daimler-hintergangen-1.3602933. The translated title means "BMW feels trapped by Daimler."

[85] *Id.*

73.     Immediately after the revelations, stock prices for all three companies dropped. Bloomberg reported that Volkswagen shares dropped up to 4.9 percent, Daimler shares dropped up to 3.2 percent and BMW shares dropped up to 3.4 percent.[86] These losses amount to billions of dollars.[87]

## V.    CLASS ACTION ALLEGATIONS

### A.    Class Definitions

74.     Pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action seeking equitable and injunctive relief under Section 1 of the Sherman Act, and damages and civil penalties under the RICO, on behalf of themselves and the following class:

**Nationwide Class:**

All persons and entities who purchased or leased a Class Vehicle in the United States (including its territories and the District of Columbia) during the Class Period.

75.     Class Vehicles are German Luxury Vehicles distributed in the United States by the Defendants or their subsidiaries, as well as all other vehicle models distributed by the Defendants in the United States, during the Class Period.

---

[86] Forden, *supra* note 12.

[87] Thomas Fromm & Wolfgang Janisch, *Wer die Autokonzerne verklagen kann*, Süddeutsche Zeitung (July 24, 2017) http://www.sueddeutsche.de/wirtschaft/autokartell-wer-die-autokonzerne-verklagen-kann-1.3600993.

76.     Plaintiffs also bring this action pursuant to the provisions of Rules

23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages under

state antitrust, unfair competition, and consumer protection laws on behalf of

themselves and the following classes (together, "State Classes"):

**California Class:**

All persons and entities who purchased or leased a Class Vehicle in
California during the Class Period.

**Illinois Class:**

All persons and entities who purchased or leased a Class Vehicle in Illinois
during the Class Period.

77.     For both the Nationwide and State Classes, the Class Period runs from

1996 to the present.

78.     Excluded from the Classes are Defendants and their subsidiaries,

affiliates, or co-conspirators; all persons, including Defendant-affiliated dealers,

who purchased Class Vehicles directly from Defendants or for the purpose of

resale; all persons who make a timely election to be excluded from the Class;

governmental entities; the Judge to whom this case is assigned and his or her

immediate family; and purchasers or lessees of Class Vehicles who have released

their claims for those Vehicles through participation in the settlement of MDL No.

2762. Plaintiffs reserve the right to revise the Class definitions based upon

information learned through discovery.

79.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to relief on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

80.    This action has been brought and may be properly maintained on behalf of the Nationwide and State Classes proposed herein under Federal Rule of Civil Procedure 23.

81.    Plaintiffs reserve the right to modify the definition of the Classes prior to class certification.

**B.    Class Certification Requirements: Federal Rule of Civil Procedure 23**

82.    ***Numerosity: Rule 23(a)(1).*** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believes, based on available information on the volume of sales and registrations of Class Vehicles, that the members of the Classes number in the millions. The precise number of Class members may be ascertained from Defendants' records and vehicle registration records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and published notice.

83.   ***Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).*** This action involves significant common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

a.   Whether Defendants engaged in the conduct alleged herein;

b.   Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.   Whether Defendants agreed to share regularly with each other detailed, non-public, and/or competitively sensitive data about current and prospective technology, prices, and market strategy;

d.   Whether Defendants agreed to reduce or collaborate on the speed of technological innovation in German automotive engineering;

e.   Whether Defendants' collusion resulted in the sale of inferior Class Vehicles;

f.   Whether Defendants conspired to artificially inflate the prices of the Class Vehicles;

g.      Whether Plaintiffs and the other Class members had fewer vehicle choices than they would have had if Defendants had not engaged in the conduct alleged herein;

h.      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles as a result of Defendants' collusion;

i.      The identity of the participants and co-conspirators in the scheme alleged herein;

j.      Whether Defendants made material misrepresentations and/or concealed facts regarding the true nature of their relationships with each other;

k.      Whether Defendants' concealment of the true nature of the relationship between the Defendants would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing the Class Vehicles;

l.      Whether Defendants' conduct violates the Sherman Act, RICO, and state consumer protection and unfair competition statutes;

m.      Whether Plaintiffs and Class members had reason to know of or suspect the Defendants' conduct or means to discover the collusion;

n.    Whether Defendants fraudulently concealed their conduct from Plaintiffs and Class members;

o.    Whether Plaintiffs and Class members were injured in their business or property by Defendants' conduct;

p.    Whether Plaintiffs and Class members are entitled to equitable relief, including, but not limited to restitution or injunctive relief; and

q.    Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

84.    ***Typicality: Rule 23(a)(3).*** Plaintiffs' claims are typical of the claims of the Class members they seek to represent under Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs and each Class member purchased a Class Vehicle and were similarly injured as a direct and proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

85.    ***Adequacy: Rule 23(a)(4).*** Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have retained counsel competent and

experienced in complex class action litigation, including litigation against automobile manufactures and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

86.    ***Declaratory and Injunctive Relief: Rule 23(b)(2).*** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

87.    ***Superiority: Rule 23(b)(3).*** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The injury suffered by Plaintiffs and the other Class members is relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

88.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

## A.    Discovery Rule

89.    The tolling doctrine was made for cases of concealment like this one. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were secretly meeting and colluding on numerous aspects of their vehicles, that Defendants were concealing and misrepresenting the true nature of the "competition," or lack thereof, that was ongoing between the Defendants to the driving public, and/or that the Defendants were using these secret meetings to artificially inflate prices to consumers, lower their own supplier costs, and reduce or control technological advancement.

90.    Plaintiffs and Class members had no realistic ability to discover the presence of this collusion, or to otherwise learn of the Defendants anticompetitive behavior, until it was discovered and reported by *Der Spiegel* on July 21, 2017.

91.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

**B.    Fraudulent Concealment**

92.    All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

93.    Defendants have known of these secret, anticompetitive meetings since the 1990s when the Defendants began having them. Since then Defendants have intentionally concealed them from, or failed to notify, regulators, Plaintiffs, Class Members, and the driving public.

94.    Despite knowing about their anticompetitive behavior for this entire period, Defendants did not acknowledge the problem to the public, and in fact actively concealed it, until after *Der Spiegel* published the exposé.  Defendants still deny that these meetings were in violation of the laws.

95.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

**C.    Estoppel**

96.    Defendants were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true nature of their relationship with the other Defendants. This is underscored by the contrast between Defendants' misleading statements to the public—both in advertising and in public statements by

executives about the virtues of competition—and their internal acknowledgement that the meetings were secret and potentially illegal. Instead, Defendants actively concealed the nature of their relationship with other Defendants and the effect that relationship had on the prices and technology in Class Vehicles and knowingly made misrepresentations about the same.

97.    Plaintiffs and Class members reasonably relied upon Defendants' active concealment of these facts that rendered their statements misleading.

98.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VII.   CLAIMS FOR RELIEF

## A.    Claims Asserted on Behalf of the Nationwide Class

### COUNT ONE — VIOLATIONS OF FEDERAL ANTITRUST LAW

99.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

100.    Plaintiffs bring this claim against all Defendants on behalf of the Nationwide Class.

101.    Defendants and their co-conspirators entered into a combination and/or conspiracy in restraint of trade, and thereby violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

102.    Specifically, Defendants conspired and agreed to restrain trade and commerce by restricting technological advancement and sharing competitively sensitive technology, by stabilizing and/or restraining research and development and supplier costs of the Class Vehicles.

103.    The Defendants engaged in numerous anticompetitive activities, as alleged herein, in order to create and undertake this unlawful combination or conspiracy. These activities and acts were done in furtherance of the conspiracy and/or combination in restraint of trade, and were undertaken, authorized, or ordered by officers, employees, and agents of Defendants while engaged in the management of Defendants' business.

104.    The collusion, conspiracy, and combination between the Defendants extended to numerous areas of vehicle development and component parts including but not limited to brakes, suspension, transmissions, electronic systems, mechanical systems such as convertible roofs, and diesel exhaust aftertreatment.

105.    These activities were directed at the United States market for German Luxury Vehicles.

106.    The effects of this collusion were multifarious, but each effect increased the anticompetitive result. Defendants' conspiracy eliminated or substantially reduced competition, leaving limited consumer choice. Not only was competition eliminated or restrained between the German Five manufacturers, but

the collusion between them eliminated or suppressed competition from other European automakers in the United States.

107.   Finally, by maintaining premium prices despite the reduced research and development and component part costs for the German Five that resulted from their unlawful conspiracy, and by failing to compete among themselves, the Defendants artificially inflated the prices they charged consumers and the profits that resulted.

108.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured in their business and property, and will continue to be injured if Defendants' conduct is not enjoined.

109.   Plaintiffs and Class members are therefore entitled to injunctive relief against Defendants under the Clayton Act.

## COUNT TWO — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

110.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

111.   Plaintiffs bring this Count on behalf of the Nationwide Class against the Volkswagen, Audi, Porsche, Daimler, and BMW Defendants, the "RICO Defendants."

112.   Each of the Defendants conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, including VWGOA,

BMW America, Audi America, MBUSA, MBUSI, PCNA, as well as separate entities for other brands like Mini and Rolls-Royce (BMW), Smart (Daimler), Bentley, Lamborghini, and Bugatti (Volkswagen), each of which is a separate legal entity. At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

113.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

114.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

115.    To maximize both their market share and their profits, the German Five automakers have met more than 1000 times since the mid-1990s in order to conspire together rather than compete in the marketplace. The areas of collusion included, for nearly every aspect of their products, limiting technological advancement and competition between them, sharing competitively sensitive product plans and technology, adopting shared standards, and colluding to select suppliers. Specific examples include the speed at which powered convertible roofs

may be operated and the size of emissions aftertreatment tanks (contributing to, and prolonging, the "Dieselgate" emissions cheating scandal).

116.   The result of this collusion in the United States was the near-complete elimination of competition in the marketplace, all while the German Five were able to simultaneously cut research and development and supplier costs while continuing to charge price premiums to consumers. The RICO Defendants' competitors in United States were unable to be profitable. Some, like Saab, have been driven out of business completely.

117.   Others have undergone a painful series of acquisitions and bankruptcies—for example, after the RICO Defendants' conspiracy began, Ford acquired the unprofitable Jaguar, Aston Martin, Land Rover, and Volvo brands. Even with Ford's distribution and dealer infrastructure in the United States, and even developing vehicles that used existing Ford platforms and parts, these carmakers could not be profitable in competition with the German Five in the United States, and each was ultimately sold off to investors in China, India, or the Middle East.

118.   Some former competitors that are now profitable in the United States are profitable in large part because they are now owned by the German Five and benefit from their shared technology and lowered costs of research and

development. These brands include Volkswagen's Lamborghini and Bentley and BMW's Rolls-Royce and Mini.

119.   Meanwhile, other European carmakers that left the United States market—such as the French automakers Renault and Peugeot—faced difficulties in returning due to the extraordinary barriers to entry that are only heightened by the RICO Defendants' conspiracy. Those that have returned have done so only with the aid of an existing dealer network: namely, Fiat and Alfa Romeo have capitalized on Chrysler's existing dealer and distribution infrastructure. Nonetheless, they have not made a significant dent in the RICO Defendants' dominance of the market.

120.   Throughout this period, the RICO Defendants frequently saw year-over-year profits increase, and are now the largest and most profitable carmakers in the American market for European cars, among the most profitable in the world, and in Volkswagen's case, the largest or second-largest worldwide.

121.   The effects of the RICO Defendants' conspiracy extend beyond growing market share and record profits at the expense of both competitors and consumers, however: one aspect of the conspiracy included limiting the size of emissions aftertreatment tanks. The RICO Defendants agreed not to offer larger tanks lest regulators be tipped off that the small tanks were insufficient. This decision ultimately resulted in the massive Dieselgate scandal, where it was

revealed that Volkswagen, Audi, and Porsche vehicles were polluting at up to 40 times the legal limit during normal operation, and cheating on emissions testing. Similar lawsuits and a federal investigation are now pending against Daimler's Mercedes-Benz brand. In Europe, Daimler has already agreed to recall and repair numerous Mercedes-Benz diesel vehicles.

122.   To accomplish their scheme or common course of conduct, the RICO Defendants, along with others, had to work together to conceal the truth. Each Defendant was employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "Cartel RICO Enterprise"). The purpose of the Cartel RICO Enterprise was to collude to lower costs and competition, share technology, and maximize market share and profit worldwide, all while deceiving consumers and regulators into believing that the cartel's members were actually fiercely competing with each other. The motivation was simple: to increase the RICO Defendants' revenues and profits and minimize their losses in the design, manufacture, distribution and sale of the Class Vehicles and their component parts. As a direct and proximate result of their fraudulent scheme and common course of conduct, the RICO Defendants were able to crush their competition in the United States and extract billions of dollars from American consumers over a period of

more than twenty years. As explained below, their years-long misconduct violated Sections 1962(c) and (d).

123. At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown suppliers involved in the design, calibration, manufacture, testing, marketing, and sale of the Class Vehicles or the component parts thereof, operated an association-in-fact enterprise, which was formed for the aforementioned purposes, and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4). The enterprise is called the "Cartel RICO Enterprise."

124. At all relevant times, the Cartel RICO Enterprise and its component "working groups" constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the RICO Defendants' unlawful profit-making scheme.

125. The association-in-fact Cartel RICO Enterprise consisted of at least the following entities and individuals, and likely others: Volkswagen AG and Volkswagen Group of America, Inc; Audi AG and Audi of America, LLC; Dr. Ing. h.c. F. Porsche AG and Porsche Cars of North America, Inc.; Daimler AG, Mercedes-Benz USA, LLC, and Mercedes-Benz US International, Inc.; and Bayerische Motoren Werke AG and BMW North America, LLC. Each of these is a

distinct legal entity, and each knew or recklessly disregarded that the Class Vehicles were the product of collusion and conspiracy.

126.    Working with other members of the Cartel RICO Enterprise, executives of Volkswagen AG, Audi AG, Porsche AG, Daimler AG, and BMW AG, along with their subsidiaries, formed "working groups" in order to share competitively sensitive technology, limit technological development, and select suppliers and limit costs, all while maintaining premium prices on their products. They further conspired to cover up each other's violations of the law through emissions cheating and other fraudulent conduct, and to conceal the existence of the conspiracy from legitimate industry groups, government regulators, consumers, and competitors.

127.    At least as to the emissions cheating aspect of the conspiracy, certain suppliers acted as co-conspirators. Robert Bosch GmbH ("Bosch"), another wholly distinct legal entity, worked with Volkswagen, Audi, and Porsche to develop and implement the "defeat device" by which the "Dieselgate" emissions cheating scheme was implemented. Bosch also supplied diesel engine and emissions controls to Daimler that are the subject of similar accusations.

128.    *Der Spiegel* reports that Bosch even attended the meetings of the Cartel RICO Enterprise in order to develop and conspire to implement the emissions cheating scheme: after a meeting between Daimler AG, BMW AG, Audi

AG, Volkswagen AG, Porsche AG, and Bosch on October 19, 2006, a Volkswagen

executive was reported to have said (translated from German): "Everyone wants a

limit" on emissions treatment injection "because of the limited size of the urea

tanks. Nobody wants the true motivation of this limitation [to reach] the authorities

(CARB, EPA)."[88] *Bild am Sonntag* reports that internal documents confirm

Bosch's attendance as well as coordination between at least Audi and Daimler on

the exhaust aftertreatment emissions cheating scheme.[89]

129.    The Cartel RICO Enterprise reportedly began as early as the mid-

1990s, long before the merger of Volkswagen and Porsche. It was not until July

2017 that the scheme was revealed, when *Der Spiegel* reported that Volkswagen

had self-reported possible antitrust violations to German regulators, and later

reported that Daimler had also self-reported possible violations.

130.    At all relevant times, the Cartel RICO Enterprise: (a) had an existence

separate and distinct from each RICO Defendant; (b) was separate and distinct

from the pattern of racketeering in which the RICO Defendants engaged; and (c)

was an ongoing and continuing organization consisting of legal entities, including

the RICO Defendants and co-conspirators like Bosch, their executives, and other

---

[88] Frank Dohmen, "Bosch an Absprachen der Autokonzerne beteiligt," *Der Spiegel*, July 28, 2017, http://www.spiegel.de/wirtschaft/unternehmen/bosch-beteiligt-bei-absprachen-von-daimler-bmw-audi-volkswagen-und-porsche-a-1160101.html (last visited July 28, 2017).

[89] Kayhan Özgenc and Jan-Christopher Wehmeyer, "Bosch an Geheimabsprachen der Autobauer Beteiligt," *Bild am Sonntag*, July 28, 2017.

entities and individuals associated for the common purpose of designing,

calibrating, manufacturing, distributing, testing, marketing, and selling the Class

Vehicles to consumers in the Nationwide and State Classes, and deriving profits

and revenues from those activities. Each member of the Cartel RICO Enterprise

shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived

from increased profits generated by the scheme.

131.    The Cartel RICO Enterprise functioned by selling vehicles and

component parts to the consuming public. Many of these products are legitimate,

including automobiles not subject to the diesel emissions cheating aspect of the

conspiracy. However, the RICO Defendants and their co-conspirators, through

their illegal Enterprise, engaged in a pattern of racketeering activity, which

involves a fraudulent scheme to increase profits for Defendants and the other

entities and individuals associated-in-fact with the Enterprise's activities through

the illegal scheme.

132.    The Cartel RICO Enterprise engaged in, and its activities affected,

interstate and foreign commerce, because it involved commercial activities across

state boundaries, such as the marketing, promotion, advertisement and sale or lease

of the Class Vehicles throughout the country, and the receipt of revenue from the

sale of the same. The communications and meetings by which the Cartel RICO

Enterprise conducted its scheme took place all over the world, in the United States

and abroad. The Cartel RICO Enterprise's activities affected consumers worldwide, but directly and perhaps most strongly affected commerce within the United States by removing competing manufacturers from the marketplace and imposing, through unlawful means, impenetrable barriers to entry.

133.   Within the Cartel RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. This network entailed both formal and informal communications, including in-person meetings of the Enterprise "working groups" and regular email, telephone, and informal in-person communications. The enterprise used this common communication network for the purposes of sharing competitively sensitive technology, limiting technological development, and selecting suppliers and limit costs, all while maintaining premium prices on their products and concealing each other's wrongdoing.

134.   Each participant in the Cartel RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Cartel RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

135.   The RICO Defendants participated in the operation and management of the Cartel Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. Without the RICO Defendants' willing participation, the Enterprise's scheme and common course of conduct would have been unsuccessful.

136.   The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands. Similarly, because the Defendants often refer to themselves as a group (such as "Volkswagen Group" rather than "Volkswagen AG" or "Volkswagen Group of America"), Plaintiff cannot fully know the extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

137.   To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the Cartel RICO Enterprise, did knowingly conduct or participate in , directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity

within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

138.   Specifically, as alleged herein, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343). The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the Cartel RICO Enterprise. On information and belief, much of the racketeering activity occurred in the United States. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

139.   The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications into and within the United States in service of their scheme through misrepresentations, concealments and material omissions.

140. In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and Class members or to obtain money from Plaintiff and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

141. The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.   Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to develop, design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b.   Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose

of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

142.    The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme: the Class Vehicles themselves; component parts of the Class Vehicles that were the subject of collusion between the RICO Defendants and co-conspirator suppliers, including Bosch; false or misleading emission test results for diesel vehicles and the resulting fraudulently-obtained regulatory certifications; false or misleading communications intended to prevent regulators and the public from discovering the true nature of the relationship between the RICO Defendants; sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true relationship between the RICO Defendants and the true nature of the Class Vehicles; documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence; documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts; payments to participating suppliers and coconspirators, and millions of dollars in compensation

to participating executives; deposits of proceeds; and/or other documents and things, including electronic communications.

143.   The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about the Class Vehicles on their websites, YouTube, and through advertising online, all of which were intended to mislead regulators and the public about technological developments, emission standards, and the true relationships between the RICO Defendants.

144.   The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

145.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles.

146.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud and the period during which

they occurred. These include thousands of communications to perpetuate and maintain the scheme, including the types of things and documents described in the preceding paragraphs.

147.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

148.    The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

149.    To achieve their common goals, the RICO Defendants hid from the general public the true nature of their relationship and the true nature of the Class Vehicles. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about these matters and about

65

the discrepancies in emissions testing and the concealed defeat devices present in certain of the Class Vehicles.

150.    With knowledge and intent, the RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency.

151.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use (or to *not* use in order to avoid competition between the RICO Defendants) the same or similar technology, illicit emissions control devices, and fraudulent tactics.

152.    The RICO Defendants knew and intended that United States government regulators, consumers, and competitors would rely on their material misrepresentations and omissions made about the Class Vehicles, about suppliers, about research, development, and technology, and about the relationships between the RICO Defendants. The RICO Defendants knew and intended that consumers would purchase the Class Vehicles and incur costs as a result.

153.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant revenues from Plaintiff and Class members based on their

misrepresentations and omissions. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

154.    The predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiff and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Cartel RICO Enterprise and in furtherance of its unlawful scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with actual competition in the marketplace through independent research and development in the Class Vehicles.

155.    During the design, manufacture, testing, marketing and sale of the Class Vehicles, the RICO Defendants shared among themselves technical, marketing, and financial information that revealed both competitively sensitive technology, and the existence of the unlawful emissions cheating devices contained in certain Class Vehicles. Nevertheless, the RICO Defendants chose and agreed to disseminate information that deliberately misrepresented the Class Vehicles and the true relationship between the RICO Defendants in their concerted efforts to market and sell Class Vehicles to consumers and remove nearly all alternatives from the market.

156. By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to overpayment at the time of purchase or lease for Class Vehicles purportedly having properties and benefits, including cutting-edge proprietary technology and ecologically-friendly "Clean Diesel" technology, that did not have these properties or meet these standards, and other, ongoing out-of-pocket and loss-of-use expenses.

157. The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Class members' business and property, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**B.    Claims Asserted on Behalf of the California Class**

**COUNT THREE — CALIFORNIA BUSINESS AND PROFESSIONS CODE, § 16700, *ET SEQ.***

158. Plaintiff Blevins incorporates by reference each preceding paragraph as though fully set forth herein.

159. Plaintiff Blevins brings this claim against all Defendants on behalf of the California Class.

160. Defendants have entered into an agreement and conspiracy in restraint of trade which violates the California Business and Professions Code, § 16700, *et seq*.

161. Specifically, Defendants conspired and agreed to restrain trade and commerce by restricting technological advancement and sharing competitively sensitive technology, and by stabilizing and/or restraining research and development and supplier costs the Class Vehicles.

162. The Defendants engaged in numerous anticompetitive activities, as alleged herein, in order to create and undertake this unlawful combination or conspiracy. These activities and acts were done in furtherance of the conspiracy and/or combination in restraint of trade, and were undertaken, authorized, or ordered by officers, employees, and agents of Defendants while engaged in the management of Defendants' business.

163. The collusion, conspiracy, and combination between the Defendants extended to numerous areas of vehicle development and component parts including but not limited to brakes, suspension, transmissions, electronic systems, mechanical systems such as convertible roofs, and diesel exhaust aftertreatment.

164. The effects of this collusion were multifarious, but each effect increased the anticompetitive results. Defendants' conspiracy eliminated or substantially reduced competition, leaving limited consumer choice. Not only was

competition eliminated or restrained between the German Five manufacturers, but the collusion between them eliminated or suppressed competition from other European automakers in the United States and California.

165. Defendants' conspiracy or combination in restraint of trade also resulted in the stabilization or maintenance of price and market share between the ostensible competitors among the German Five.

166. Finally, by maintaining premium prices despite the reduced research and development and component part costs that resulted from their unlawful conspiracy, and by failing to compete among themselves, the Defendants artificially inflated the prices they charged consumers and the profits that resulted.

167. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have been injured in their business and property. This constitutes an antitrust injury because Plaintiff and Class members paid more for Class Vehicles than they would have if Defendants' conduct had been known to the public at the time of purchase or lease. Defendants charged a premium price and exacted inflated profits as a result of their restraint of competition and trade, and consumers had little choice but to pay these premium prices as a result of the restrained and suppressed competition in the marketplace that resulted from Defendants' anticompetitive conduct.

168.    Plaintiff Blevins and Class members therefore request treble damages and their costs of suit, including reasonable attorneys' fees, under Cal. Bus. & Prof. Code § 16750(a).

## COUNT FOUR — CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*

169.    Plaintiff Blevins incorporates by reference each preceding paragraph as though fully set forth herein.

170.    Plaintiff Blevins brings this claim against all Defendants on behalf of the California Class.

171.    The California Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.*, prohibits all "unlawful, unfair, or fraudulent business practices."

172.    Defendants' conduct as alleged herein violates the UCL in numerous ways, including but not limited to:

      a.    falsely advertising and representing the Class Vehicles as possessing qualities—namely, cutting-edge technology and proprietary engineering—that they do not have;

      b.    conspiring to share competitively sensitive technology and otherwise limit technological competition and innovation;

71

c.    conspiring to select component part suppliers and standards, and to set or maintain component part prices, making untrue their representations concerning proprietary engineering;

d.    conspiring to install emissions-cheating devices in certain Class Vehicles in order to fraudulently pass emissions testing while polluting at many times the legal limit during normal operation, and conspiring to cover up this scheme; and

e.    by violating federal and California state laws as alleged herein.

173.    Plaintiff Blevins and Class members paid the premium prices Defendants charged for the Class Vehicles, which were inflated as a result of Defendants' unlawful, unfair, and fraudulent conduct.

174.    Plaintiff Blevins and Class members have been and are being injured as a result of Defendants' conduct, and therefore seek injunctive relief. In addition to enjoining Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff asks the Court to order Defendants to restore or disgorge the money they have received from Plaintiff and Class members by unlawful competition.

## C.    Claims Asserted on Behalf of the Illinois Class

## COUNT FIVE — ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. 10/3(1), *ET SEQ.*

175.    Plaintiff Bogomolov incorporates by reference each preceding paragraph as though fully set forth herein.

72

176.   Plaintiff Bogomolov brings this claim against all Defendants on behalf of the Illinois Class.

177.   The Illinois Antitrust Act prohibits "restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade." 740 ILCS 10/2.

178.   Defendants have engaged in a combination or conspiracy with each other in restraint of trade and in order to decrease competition between them.

179.   Specifically, Defendants conspired and agreed to restrain trade and commerce by restricting technological advancement and sharing competitively sensitive technology, and by stabilizing and/or restraining research and development and supplier costs the Class Vehicles.

180.   The Defendants engaged in numerous anticompetitive activities, as alleged herein, in order to create and undertake this unlawful combination or conspiracy. These activities and acts were done in furtherance of the conspiracy and/or combination in restraint of trade, and were undertaken, authorized, or ordered by officers, employees, and agents of Defendants while engaged in the management of Defendants' business.

181.   The collusion, conspiracy, and combination between the Defendants extended to numerous areas of vehicle development and component parts including

73

but not limited to brakes, suspension, transmissions, electronic systems, mechanical systems such as convertible roofs, and diesel exhaust aftertreatment.

182.    The effects of this collusion were multifarious, but each effect increased the anticompetitive results. Defendants' conspiracy eliminated or substantially reduced competition, leaving limited consumer choice. Not only was competition eliminated or restrained between the German Five manufacturers, but the collusion between them eliminated or suppressed competition from other European automakers in the United States and Illinois.

183.    Finally, by maintaining premium prices despite the reduced research and development and component part costs that resulted from their unlawful conspiracy, and by failing to compete among themselves, the Defendants artificially inflated the prices they charged consumers and the profits that resulted.

184.    As a direct and proximate result of Defendants' conduct, Plaintiff Bogomolov and Class members have been injured in their business and property. This constitutes an antitrust injury because Plaintiffs and Class members paid more for Class Vehicles than they would have if Defendants' conduct had been known to the public at the time of purchase or lease. Defendants charged a premium price and exacted inflated profits as a result of their restraint of competition and trade, and consumers had little choice but to pay these premium prices as a result of the

restrained and suppressed competition in the marketplace that resulted from Defendants' anticompetitive conduct.

185.    Plaintiff Bogomolov and Class members therefore request treble damages and their costs of suit, including reasonable attorneys' fees, under the Illinois Antitrust Act.

## COUNT SIX — ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. 505/10A, *ET SEQ.*

186.    Plaintiff Bogomolov incorporates by reference each preceding paragraph as though fully set forth herein.

187.    Plaintiff Bogomolov brings this claim against all Defendants on behalf of the Illinois Class.

188.    The Illinois Consumer Fraud And Deceptive Business Practices Act prohibits unfair methods of competition and unfair or deceptive acts or practices. Defendants' conduct as alleged herein was unfair, unconscionable, or deceptive and was conducted in the course of Defendants' commercial activities within Illinois.

189.    Defendants' unfair and deceptive conduct includes but is not limited to:

    a.    falsely advertising and representing the Class Vehicles as possessing qualities—namely, cutting-edge technology and proprietary engineering—that they do not have;

b. conspiring to share competitively sensitive technology and otherwise limit technological competition and innovation;

c. conspiring to select component part suppliers and standards, and to set or maintain component part prices, making untrue their representations concerning proprietary engineering;

d. conspiring to install emissions-cheating devices in certain Class Vehicles in order to fraudulently pass emissions testing while polluting at many times the legal limit during normal operation, and conspiring to cover up this scheme; and

e. by violating federal and Illinois state laws as alleged herein.

190. Plaintiff Bogomolov and Class members paid the premium prices Defendants charged for the Class Vehicles, which were inflated as a result of Defendants' unlawful, unfair, and fraudulent conduct.

191. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff Bogomolov and the Illinois Class were actually deceived and have been injured in their business or property, and face the ongoing threat of further injury.

192. For the foregoing reasons, Plaintiff Bogomolov and the Illinois Class seek injunctive relief, actual damages, and any other relief the Court deems proper, including their reasonable costs and attorneys' fees.

## VIII.  PRAYER FOR RELIEF

WHEREFORE,  Plaintiffs, individually and on behalf of members of the

Nationwide Class and State Classes, respectfully request:

    a.    An order certifying the proposed Class or Classes under the

        provisions of Rule 23 of the Federal Rules of Civil Procedure,

        and directing that notice be provided to all members of the

        Classes;

    b.    A declaration that any applicable statutes of limitation are tolled

        due to the fraudulent concealment alleged in this complaint, and

        that Defendants are estopped from relying on any statutes of

        limitations in defense;

    c.    That the Court find that the unlawful conduct, conspiracy, or

        combination alleged herein constitutes an unreasonable restraint

        of trade or commerce in violation of Section 1 of the Sherman

        Act, an unlawful combination, agreement, understanding,

        and/or concert of action in violation of the state unfair

        competition, and consumer protection laws;

    d.    An order enjoining Defendants from continuing the unlawful,

        deceptive, fraudulent, and unfair business practices alleged in

        this Complaint;

e.  That Plaintiffs and Class members recover damages in the form of restitution or disgorgement and/or compensatory damages for economic loss and out-of-pocket costs, treble damages under the applicable federal and state laws, and punitive and exemplary damages under applicable law;

f.  A determination that Defendants are financially responsible for all Class notice and administration of Class relief;

g.  A judgment against Defendants for any and all applicable statutory and civil penalties;

h.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

i.  An award to Plaintiffs and Class members of costs and reasonable attorneys' fees;

j.  Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

k.  Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all issues so triable.

78

Dated: August 25, 2017

/s/ James E. Cecchi
James Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO,
P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
Email: jcecchi@carellabyrne.com

Lynn Lincoln Sarko
Gretchen Freeman Cappio
Ryan McDevitt
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.: (206) 623-1900
Fax: (206) 623-3384
Email: lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com

*Attorneys for Plaintiffs*